BROWNING, Appellant,

v.

OHIO STATE HIGHWAY PATROL, Appellee.

[Cite as *Browning v. Ohio State Hwy. Patrol*, 151 Ohio App.3d 798, 2003-Ohio-1108.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–814.

Decided March 11, 2003.

800

Rich, Crites & Wesp, Jeffrey A. Dittmer, E. Joel Wesp and Joseph R. Durham, for appellant.

Jim Petro, Attorney General, John P. Reichley and James P. Dinsmore, Assistant Attorneys General, for appellee.

———————

Tyack, Judge.

{¶ 1} On February 11, 2000, Dena Browning filed a complaint in the Ohio Court of Claims in which she named the Ohio State Highway Patrol ("highway patrol"), Trooper Edward Mejia Jr., and Patrol Sergeant Michael D. Black as defendants. The complaint included eleven separate counts, including counts designed to ascertain whether Trooper Mejia and Sergeant Black had been acting within the scope of their employment when the activities giving rise to the claim had occurred.

{¶ 2} A judge of the Ohio Court of Claims journalized a prescreening entry that removed Trooper Mejia and Sergeant Black as named defendants, since only state agencies and instrumentalities can be defendants in original actions in the Ohio Court of Claims. See R.C. 2743.02(E). The prescreening entry also struck claims for attorney fees and punitive damages.

{¶ 3} The Highway Patrol filed an answer and two months later an amended answer. Soon thereafter, the Highway Patrol put Trooper Mejia on notice that the patrol was taking the position that Trooper Mejia was acting outside the scope of his employment with the Highway Patrol when he had engaged in sexual activity with former Trooper Dena Browning.

{¶ 4} A judge of the Ohio Court of Claims bifurcated the issues of liability and damages for trial. Trial on the liability issues commenced on August 28, 2001. The parties filed post-trial briefs and a transcript of the trial was prepared for the court's review prior to judgment being rendered. On June 25, 2002, the trial court issued a judgment finding that the Highway Patrol was not liable to Browning. Concurrently therewith, the court found that Trooper Mejia and Sergeant Black were not entitled to civil immunity as state employees acting within the scope of their employment.

{¶ 5} Counsel for Browning has now pursued a direct appeal of the trial court's findings, assigning seven errors for our consideration:

{¶ 6} "1. The trial court erred in finding that Dena Browning failed to prove her claim for sexual harassment by a preponderance of the evidence. Such a finding is unsupported by the evidence and is against the manifest weight of the evidence.

{¶ 7} "2. The trial court erred in finding that Trooper Edward Mejia and Sgt. Michael Black acted outside the scope of their employment and therefore are not entitled to personal civil immunity pursuant to Revised Code 9.86 and 2743.02(F).

Such a finding is unsupported by the evidence and is against the manifest weight of the evidence.

{¶ 8} "3. The trial court erred in finding that Dena Browning failed to prove her claim of negligent hiring/retention by a preponderance of the evidence. Such a finding is unsupported by the evidence and is against the manifest weight of the evidence.

{¶ 9} "4. The trial court erred in finding that Dena Browning has failed to prove her claim of negligent supervision by a preponderance of the evidence. Such a finding is unsupported by the evidence and is against the manifest weight of the evidence.

{¶ 10} "5. The trial court erred in finding that Dena Browning failed to prove her claim of wrongful discharge by a preponderance of the evidence. Such a finding is unsupported by the evidence and is against the manifest weight of the evidence.

{¶ 11} "6. The trial court erred in finding that Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in employment situations and denying Dena Browning's claim for negligent infliction of emotional distress.

{¶ 12} "7. The trial court erred in finding that Dena Browning failed to prove her claim of invasion of privacy by a preponderance of the evidence. Such a finding is unsupported by the evidence and is against the manifest weight of the evidence."

{¶ 13} Six of the seven assignments of error allege that the trial court's findings were against the manifest weight of the evidence. We, therefore, initially address the legal standard applicable to an appellate court when it addresses a claim that a trial court's judgment is against the manifest weight of the evidence.

{¶ 14} In determining whether a judgment is against the manifest weight of the evidence, we do not normally decide issues involving credibility, and we will not simply substitute our judgment for that of the trial court. *Oleske v. Hilliard City School Dist. Bd. of Edn.* (2001), 146 Ohio App.3d 57, 64–65, 764 N.E.2d 1110. When reviewing evidence presented in a bench trial, we defer to the findings of the trial judge who is best able weigh credibility by viewing the witnesses and observing their demeanor. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. We do not reweigh evidence. *In re Estate of Clapsaddle* (1992), 79 Ohio App.3d 747, 755, 607 N.E.2d 1148. A judgment supported by some competent, credible evidence going to all the essential elements of the claims upon which it is rendered will not be reversed as being

against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578.

{¶ 15} In the first assignment of error, counsel for Browning alleges that the trial court's ruling that she failed to prove sexual harassment by a preponderance of the evidence was against the manifest weight of the evidence. To address this assignment of error, as well as the others based upon manifest weight, we must set forth a detailed review of the evidence presented at trial.

{¶ 16} Browning was the first witness. Her counsel guided her through a series of questions about her family history, her history of incidents where she got intoxicated, and a list of the men with whom she had had sexual relations prior to marrying her former husband.

{¶ 17} Browning testified about her decision to become a trooper with the Highway Patrol. She entered the patrol academy in October 1997. She described her training at length. Trooper Mejia was one of the 90-day instructors, whose job included making life miserable for the cadets. Browning started out training with feelings of hatred for Trooper Mejia. She learned before graduation that he was married.

{¶ 18} Browning graduated from the Highway Patrol Academy on May 8, 1998, and became a probationary trooper. As a probationary trooper, she was assigned to a field training officer to continue her training. As a probationary trooper, she had most of the rights of a full trooper, except she could not file a grievance if she were to be terminated.

{¶ 19} After working in the field for several weeks, the probationary troopers returned to the Highway Patrol Academy for postgraduate training for five days. In general, the probationary troopers were treated with more respect than they had been when cadets, but they were still clearly subordinate to the instructors.

{¶ 20} Browning testified that the instructors informed the probationary troopers of a ritual held with every returning postgraduate class in which the academy staff and the probationary troopers went out for drinks at Columbus area bars. Maps were provided to help the probationary troopers find the bars. Browning rode over to the bars with at least three other female troopers. A total of at least six of the probationary troopers were women.

{¶ 21} Trooper Mejia and Sergeant Black each arrived at one of the bars, BW-3, later than the probationary troopers. Browning had consumed a wine cooler and was about halfway through her second wine cooler when Trooper Mejia summoned her to his table. Sometime while they were at BW-3, she finished her second wine cooler and drank a strawberry daiquiri. She talked to Trooper Mejia for 10 to 15 minutes.

{¶ 22}   Later, the instructors at the academy and the probationary trooper transferred their drinking to a different bar called "Shooters."  Browning sat with Trooper Mejia, Sergeant Black, and another probationary trooper on bar stools at Shooters.  Browning described herself as already feeling hot, tired, and a little dizzy before she started drinking at Shooters.

{¶ 23}   Trooper Mejia bought Browning between three and seven drinks at Shooters.  Browning claimed that she drank shots of alcohol in one gulp because Trooper Mejia and Sergeant Black told her that if she wanted a job like a man she had to drink like a man.

{¶ 24}   Browning had two dances with other probationary troopers.  She testified that Trooper Mejia then took her arm and pulled on her to go back to his seat at the bar with him.

{¶ 25}   Browning's interaction with Trooper Mejia progressed from conversation, to touching each other's legs, to kissing.  Browning was not sure where she got touched in the bar because in her words, "[b]y then the alcohol was kicking in and I wasn't really paying much attention."

{¶ 26}   Later, she said she kept drinking and permitted Trooper Mejia's touching and kissing because "I guess it stems back to where I was afraid of him."

{¶ 27}   Eventually, Browning noticed that she and Trooper Mejia were the only two persons affiliated with the Highway Patrol Academy who were still at the bar.  She then accepted a ride back to the academy from Trooper Mejia.  They kissed during the ride and Trooper Mejia hugged her.

{¶ 28}   Trooper Mejia got Browning back into the Highway Patrol Academy building and eventually she found her room.  She got up and went to the restroom to throw up three or four times.  She does not recall having sexual intercourse, but concluded that she did when she found blood in her underwear and experienced burning when she urinated.  She also was observed by a classmate as having a "hicky" on her neck.  The same classmate claimed to have seen Trooper Mejia in Browning's bedroom.  As a result, Browning concluded that she had been sexually harassed and assaulted.

{¶ 29}   Browning was terminated from her position with the Highway Patrol on September 25, 1998, for "conduct unbecoming an officer."  She did not tell her family or fiancé until after their wedding on October 17, 1998.

{¶ 30}   During Browning's testimony, she identified a tape recording of a conversation she had with Trooper Mejia on August 31, 1998.  The conversation which occurred after their encounter and before her firing did not reflect any hostility between the two.

{¶ 31} At the end of her direct testimony, Browning was asked:

{¶ 32} "Q. Is there anything that Trooper Mejia did that was related to his employment with the highway patrol?

{¶ 33} "A. Other than let me in the back door after curfew, not that I know of, no."

{¶ 34} On cross-examination, Browning acknowledged that she had violated several rules and regulations which applied to her, including being drunk on the patrol academy premises, violating an 11:00 p.m. curfew, and having sexual contact on the academy's premises. Browning also acknowledged receiving some training on the subject of sexual harassment and how to deal with it.

{¶ 35} The second witness at trial was Dr. Alfred Elsworth Staubus, a professor at Ohio State University who teaches in the area called pharmokinetic. Dr. Staubus was qualified as an expert to testify about the course of drugs and alcohol in the human body, including how long the substances are stored in and how quickly they are eliminated from the human body. Dr. Staubus calculated Browning's blood-alcohol concentration to be in the range of .100 to .152 grams per deciliters on the evening of her sexual activity with Trooper Mejia. With this blood-alcohol concentration, Browning would have been in the upper level of the euphoria stage of intoxication.

{¶ 36} The next witness was Lieutenant Reginald Lumpkins of the Highway Patrol. Lieutenant Lumpkins participated in the administrative investigation of the encounter between Trooper Mejia and Browning in August 1998. A female trooper in Browning's class had reported seeing Browning and Trooper Mejia in the same room at the Highway Patrol Academy under circumstances that indicated that the two had had sexual relations. Lieutenant Lumpkins participated in the investigation of potential disciplinary charges based upon that report.

{¶ 37} Dr. James P. Reardon, a licensed psychologist, was next called to the witness stand. Dr. Reardon has over 24 years of experience as a psychologist. Dr. Reardon was requested to give testimony about the impact of Trooper Mejia's role as Browning's instructor on Browning's ability to exercise independent judgment in August 1998. Dr. Reardon also was asked to comment about Browning's conduct during the time her activity with Trooper Mejier was being investigated. Dr. Reardon based his expert opinion on several depositions of persons present at Shooters bar, interviews of Browning, and an interview of Browning's mother.

{¶ 38} Dr. Reardon testified that Browning regarded Trooper Mejia as a significant authority figure who had control and influence over her continuation as a trooper. As a result, she viewed Trooper Mejia's requests as orders that she had to follow. This view, in Dr. Reardon's opinion, extended all the way to

requests for Browning to drink more and encouragement for her to engage in sexual conduct.

{¶ 39} Darius Roberts, a member of the Highway Patrol, was called to testify as on cross-examination as the next witness. Trooper Roberts had been in the same patrol class as Browning, but did not go to the social event at BW–3 and Shooters. Trooper Roberts described various parts of their academy experience.

{¶ 40} Sergeant Sheldon Robinson of the Highway Patrol was called to testify on cross-examination also. Sergeant Robinson was a permanent instructor at the academy from February 1988 on. Sergeant Robinson did not attend the social event at BW–3 and Shooters. Later, Trooper Mejia told Sergeant Robinson that following the social event he (Trooper Mejia) had had sexual relations with Browning in his room.

{¶ 41} Trooper Mejia was the next witness called as on cross-examination. Trooper Mejia had graduated from the Highway Patrol Academy in 1990. After serving seven years at the Xenia Highway Patrol Post, he was returned to the patrol academy as a temporary instructor. After his activity with Browning, he was returned to the Xenia patrol post and in September 1998, he was terminated from the patrol. However, by pursuing a grievance, he was able to get his job back following arbitration.

{¶ 42} Trooper Mejia acknowledged that he had previously been disciplined as a result of his having an affair with a dispatcher at the Xenia patrol post.

{¶ 43} Trooper Mejia acknowledged buying one beer and four shots of Bacardi rum for Browning at Shooters. He acknowledged that he had his hands on her thighs at the bar, escorted her to his car, and drove her back to the patrol academy. After they entered the building, Trooper Mejia recalled Browning as going upstairs by herself and then returning to his room, where they both disrobed and had sexual relations. When he was initially questioned about his activity with Browning he lied, but later told the truth during a second interview by a Highway Patrol investigator.

{¶ 44} The next witness was Sergeant Black, who was a Highway Patrol sergeant in the summer of 1998, but had been promoted to patrol lieutenant by the date of trial. Sergeant Black had been a temporary instructor for Browning's class. He had made plans to meet friends at Shooters before he knew that Browning's class was going there. He denied being in any supervising role at Shooters either with respect to Trooper Mejia or with respect to the class members. He also denied planning the event at BW–3 and Shooters.

{¶ 45} Daryl Anderson, formerly a major with the Highway Patrol and former head of training for the Highway Patrol, testified that he was responsible for assuring that the Highway Patrol Academy functioned properly. Trooper

Mejia had been selected by then Major Anderson to work as a 90–day instructor for Browning's class. After the Mejia–Browning episode, he banned instructors from going out to such parties with post-graduate students.

{¶ 46} Trooper Raul Cuellar III was the next witness. He had been a member of Browning's class and had participated in class discussions about the members going out to a bar together. He went to BW–3 and Shooters where he consumed six to eight beers. He saw Browning and Trooper Mejia sitting together and holding each other. Trooper Cuellar danced with Browning once. He also indicated that Browning did not seem intoxicated when they danced.

{¶ 47} Trooper Cuellar was concerned about how affectionate Browning and Trooper Mejia seemed to be since he knew Trooper Mejia was married and Browning was engaged. He tried to get the two separated, but was blocked in his efforts by Trooper Mejia. By then Browning seemed intoxicated. Trooper Mejia seemed intoxicated also.

{¶ 48} Trooper Cuellar recalled Browning as saying the next morning that she thought Trooper Mejia was cute and that she had liked him throughout their time at the academy. She refused to say or was unable to say where the hicky visible the next morning had come from.

{¶ 49} The next witness was Captain Robert James Young of the Highway Patrol. Captain Young serves as executive director of human resources for the patrol. Captain Young described the supervisory structure within the Highway Patrol and the availability of records to Major Anderson. Captain Young also indicated that he had made a recommendation to his superiors in the Highway Patrol about discipline for former Trooper Browning.

{¶ 50} The next witness was Mary Cox, a fellow classmate of Browning at the Highway Patrol Academy. Cox described her recollection of the training on the subject of sexual harassment at the academy. She also testified that she had been fired for making a false statement that she had not been sexually harassed.

{¶ 51} Former Trooper Cox testified that she had been present at the party at Shooters. She saw Trooper Mejia and Browning kissing each other "throughout the time they were at Shooters." Cox testified that she felt pressured to attend the party.

{¶ 52} Before they left Shooters, Cox and two other female troopers approached Browning and Trooper Mejia about whether Browning would be leaving with them. Trooper Mejia supposedly answered for Browning and said he would be taking care of Browning. Cox also testified about Browning's condition and appearance the next morning.

{¶ 53} Various exhibits on behalf of the plaintiff were admitted and the plaintiff rested. Counsel for the Highway Patrol then called three witnesses:

Lieutenant Susan Rance–Locke, Captain Robert Young, and Trooper Deanna Barco.

{¶ 54} Trooper Barco in particular testified about the extended kissing and touching between Trooper Mejia and Browning that occurred at Shooters. Trooper Barco also invited Browning to return to the Highway Patrol Academy with her, or at least to leave with her. Browning later asked Trooper Barco to say that Trooper Mejia raped her (Browning). Trooper Barco refused.

{¶ 55} Under Ohio law, "[i]n order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 729 N.E.2d 726, at paragraph two of the syllabus.

{¶ 56} Based upon this evidence, the trial court found that Browning had engaged in consensual sexual relations with Trooper Mejia and that sexual harassment had not been proved. The court's contextual analysis was based upon "the correct inquiry," that is, whether Browning "by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Meritor Sav. Bank, FSB v. Vinson* (1986), 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49. These findings were supported by competent, credible evidence.

{¶ 57} The primary evidence indicating that the extended kissing, touching and sexual conduct was not fully consensual was the testimony of Dr. Reardon. The trial court had the discretion to assign minimal or no weight to Dr. Reardon's testimony.

{¶ 58} The existence of competent, credible evidence in the record supports the conclusion that Browning failed to establish the first element required under *Hampel.* The decision that she did not prove her sexual harassment claim is not contrary to the manifest weight of the evidence.

{¶ 59} The first assignment of error is overruled.

{¶ 60} For an employer to be liable for the tortious act of an employee under the doctrine of respondeat superior, the act must be committed within the scope of employment and, if an intentional tort, it must be calculated to facilitate or promote the employer's business or interest. *Byrd v. Faber* (1991), 57 Ohio

St.3d 56, 58, 565 N.E.2d 584; and *Elliott v. Ohio Dept. of Rehab. & Corr.* (1994), 92 Ohio App.3d 772, 776, 637 N.E.2d 106. Generally, if the employee tortfeasor acts intentionally and willfully for his own personal purposes, the employer is not responsible, even if the acts are committed while the employee is on duty. *Caruso v. State* (2000), 136 Ohio App.3d 616, 621, 737 N.E.2d 563, citing *Szydlowski v. Ohio Dept. of Rehab. & Corr.* (1992), 79 Ohio App.3d 303, 305, 607 N.E.2d 103.

{¶ 61} Major portions of the trial testimony indicated that the social gatherings at BW–3 and Shooters were not sanctioned by the Highway Patrol. Neither Sergeant Black nor Trooper Mejia was on duty at the time of the incidents. Browning herself acknowledged that Sergeant Black was acting outside his role as a patrol sergeant. Trooper Mejia's conduct in buying several drinks for Browning, kissing her, fondling her, and ultimately having sexual intercourse with her was not part of his employment with the Highway Patrol.

{¶ 62} The second assignment of error is overruled.

{¶ 63} To successfully prove her claims that the Highway Patrol was negligent in hiring and/or retaining Trooper Mejia, Browning needed to show (1) the existence of an employment relationship, (2) that Trooper Mejia was incompetent, (3) that the Highway Patrol had actual or constructive knowledge of his incompetence, (4) that the trooper's act or omission caused her injuries, and (5) that the Highway Patrol's negligence in hiring or retaining Trooper Mejia was the proximate cause of her injuries. *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 739, 680 N.E.2d 161. The legal viability of Browning's claims of negligent hiring and retention was dependent upon a showing that Trooper Mejia's conduct was foreseeable. *Wagoner v. United Dairy Farmers, Inc.* (Nov. 17, 2000), Hamilton App. No. C–990767, 2000 WL 1714252, citing *Evans* at 740, 680 N.E.2d 161. Under Ohio law, the conduct was foreseeable to the Highway Patrol "only if it knew (or should have known) of his propensity to engage in similar criminal, tortuous, or dangerous conduct." Id., citing *Byrd* at 62, 565 N.E.2d 584, and *Peters v. Ashtabula Metro. Hous. Auth.* (1993), 89 Ohio App.3d 458, 462, 624 N.E.2d 1088.

{¶ 64} In *Wagoner,* a case that involved sexual intercourse between an 18–year–old employee and a 12–year–old customer at the store where the employee worked as a clerk, the plaintiffs contended that United Dairy Farmers should have foreseen the clerk's misconduct from knowledge that the clerk (1) had flirted with teenage customers before, (2) had spoken to girls on the phone while at work, (3) had boasted about having sex or hoping to have sex with particular girls, and (4) had, while a juvenile, engaged in a sexual relationship with the minor daughter of a co-worker during off-duty hours. Id. The court found none of these incidents constituted criminal, tortious or otherwise dangerous conduct,

and, considered together, the prior behavior was insufficient as a matter of law to establish foreseeability with respect to the clerk's on-duty misconduct with the younger girl.

{¶ 65} Although Trooper Mejia had engaged in extramarital sexual relations before he became involved with Browning, his previous sexual activity did not mean that the Highway Patrol had a duty to fire him or that the Highway Patrol was negligent for hiring him in the first place. The evidence showed that the Highway Patrol had knowledge of the previous extramarital affair, confirmed by its prompt investigation to have been a consensual relationship conducted entirely outside the scope of either participant's duties. As such, the prior behavior was legally insufficient to establish foreseeability for the purpose of Browning's negligent hiring and negligent retention claims.

{¶ 66} The third assignment of error is overruled.

{¶ 67} The elements of a negligent supervision claim are the same as those for negligent hiring or retention. *Harmon v. GZK, Inc.* (Feb. 8, 2002), Montgomery App. No. 18672, 2002 WL 191598, citing *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 729, 729 N.E.2d 813. The foreseeability aspect of a negligent supervision claim is also similar. Based upon our discussion of the negligent hiring and retention claims in deciding the previous assignment of error, we find that there was competent, credible evidence in the record to support the conclusion that Browning failed to establish the negligent supervision claim as well. Since the Highway Patrol had no duty to supervise Trooper Mejia while he was engaged in his own private affairs, the Highway Patrol could not be negligent for failing to supervise him at BW-3, at Shooters, or even in his private sleeping quarters.

{¶ 68} The fourth assignment of error is overruled.

{¶ 69} By her fifth assignment of error, Browning seeks reversal, on manifest-weight grounds, of the judgment denying the claim that she was wrongfully discharged in violation of public policy. The Ohio Supreme Court first recognized that "a cause of action for wrongful discharge in violation of public policy may be brought in tort" in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph three of the syllabus, holding that "[p]ublic policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Id. at paragraph one of the syllabus. In *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus, the court extended the foundation supporting viable claims for relief beyond statutory pronouncements to include clear expressions of policy evident from other sources like constitutions, administrative rules and the common law. The

court later held in *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653, paragraph one of the syllabus, that "a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination."

{¶ 70}  To establish a claim for tortious violation of public policy, Browning was required to prove four elements: (1) that a clear public policy existed, as manifested in a state or federal Constitution, statute or regulation, or the common law; (2) that she was disciplined or dismissed under circumstances that jeopardized the public policy; (3) that the discipline or dismissal was motivated by conduct related to the public policy; and (4) that her employer lacked an overriding legitimate business justification for the discipline or dismissal. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 151, 677 N.E.2d 308.

{¶ 71}  The Highway Patrol fired both Trooper Mejia and Browning for a variety of infractions of rules and regulations.  Trooper Mejia was later reinstated in spite of opposition by the Highway Patrol as the result of mandatory arbitration under grievance procedures to which Browning did not have access due to her probationary status.  His reinstatement under those circumstances does not require a conclusion that the Highway Patrol's actions as to Browning lacked an overriding legitimate business justification.  As to her termination, we must defer to reasonable disciplinary action by an institution which is quasi-military in its structure and discipline.  Browning, by her own admission, was on patrol property while heavily intoxicated, entered the property after the permitted time, was in a male trooper's room, and lied about what happened when initially questioned.  We cannot say that firing her when she engages in such conduct while still in probationary status is unreasonable.

{¶ 72}  The fifth assignment of error is overruled.

{¶ 73}  The sixth assignment of error addresses a point of law, namely whether Ohio courts recognize claims for negligent infliction of emotional distress in employment situations.

{¶ 74}  The trial court, in denying Browning's claim for negligent infliction of emotional distress relied upon our reported case of *Antalis v. Ohio Dept. of Commerce, Div. of Consumer Finance* (1990), 68 Ohio App.3d 650, 589 N.E.2d 429.  In *Antalis,* we found:

{¶ 75}  "While appellant argues that public policy requires the court to recognize a claim for negligent infliction of emotional distress in the workplace as part of an employer's duty to provide a safe working environment, absent a clear expression of intent from the Ohio Supreme Court, we decline to expand the

application of this tort to include actions arising out of an employment situation." Id. at 654, 589 N.E.2d 429.

{¶ 76} After *Antalis,* the Supreme Court decided *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 575 N.E.2d 428, which recognizes a claim for negligent infliction of emotional distress in the workplace context. In *Kerans,* the Supreme Court included two points of law in the syllabus:

{¶ 77} "1. The workers' compensation statute does not provide the exclusive remedy for claims based upon sexual harassment in the workplace.

{¶ 78} "2. Where a plaintiff brings a claim against an employer predicated upon allegations of workplace sexual harassment by a company employee, and where there is evidence in the record suggesting that the employee has a past history of sexually harassing behavior about which the employer knew or should have known, summary judgment may not be granted in favor of the employer, even where the employee's actions in no way further or promote the employer's business."

{¶ 79} The dissent in *Kerans* clearly indicated that the majority was creating a new tort against an employer which had no foundation in common law.

{¶ 80} Case law subsequent to the *Kerans* case has uniformly limited the *Kerans* case to its facts. See, for instance, *Griswold v. Fresenius USA, Inc.* (N.D.Ohio 1997), 964 F.Supp. 1166; and *Myers v. Goodwill Industries of Akron, Inc.* (1998), 130 Ohio App.3d 722, 728, 721 N.E.2d 130 ("We decline plaintiff's invitation to extend this holding [*Kerans* ] to other instances of underlying misconduct in the absence of any indication that the Supreme Court intended to do so"). Therefore, we must address the question of whether the facts in Browning's case are so close to the facts in the *Kerans* case as to allow for a potential recovery.

{¶ 81} In *Kerans,* Sally Kerans was sexually harassed and/or assaulted five times on a single day in 1985. According to Kerans, a store manager for his employer, Porter Paint Company, touched her breasts without her consent, put his hand up her dress, forced her to touch his genitalia; exposed himself to her, appeared naked before her, and finally requested that she watch him masturbate.

{¶ 82} The crucial difference between *Kerans* and Browning's situation is that all the sexual attention in Kerans's case was unwanted. Browning voluntarily drank a significant amount of alcohol in Trooper Mejia's presence, kissed or touched Trooper Mejia, and refused an opportunity to separate herself from his presence. As noted in our discussion in the earlier assignment of error, the trial court's finding that Browning voluntarily engaged in sexual relations with Trooper Mejia was not against the manifest weight of the evidence. These factual differences take Browning outside the scope of the ruling in *Kerans.*

{¶ 83}  We also note that Trooper Mejia's past conduct was not sexual harassment of the nature revealed in *Kerans* case.  Instead, the testimony at trial indicates a single set of voluntary encounters with a different co-worker. We do not see *Kerans* as making an employer, governmental or private, liable because of past voluntary sexual relations between employees in the form of affairs conducted away from the employer's premises.

{¶ 84}  The sixth assignment of error is overruled.

{¶ 85}  The last assignment of error alleges that Browning proved an invasion of privacy.  She argues that proof of sexual harassment establishes a type of invasion of privacy recognized in *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, as "wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."  See, also, *Reef v. Ctr. for Individual Family Serv., Inc.,* Richland App. No. 02–CA–30, 2002-Ohio-5476, 2002 WL 31259906. Stated another way, " '[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.' "  *Sustin v. Fee* (1982), 69 Ohio St.2d 143, 145, 23 O.O.3d 182, 431 N.E.2d 992, quoting Restatement of the Law 2d, Torts (1977) 378, Section 652B.

{¶ 86}  This court has observed that sexual harassment in and of itself does not constitute an invasion of privacy.  *Davis v. Black* (1991), 70 Ohio App.3d 359, 591 N.E.2d 11.  However, another court recently found that whether an employer could be liable for invasion of privacy by reason of a supervisor's sexual harassment, a physical intrusion of the victim's person, was a genuine issue of material fact that should survive summary judgment and be determined by the trier of fact.  *Lamar v. A.J. Rose Mfg. Co.* (Oct. 11, 2000), Lorain App. No. 99CA007326, 2000 WL 1507919.  By contrast, this case was decided by the trier of fact.  Given the trial court's findings that the sexual conduct was consensual and voluntary, we find no basis for an invasion of privacy finding.  The trial court's rejection of this theory of liability was supported by competent, credible evidence.

{¶ 87}  The seventh assignment of error is overruled.

{¶ 88}  All seven assignments of error having been overruled, we affirm the judgment of the trial court.

Judgment affirmed.

DESHLER and BOWMAN, JJ., concur.