[Cite as *Shepherd v. Ohio Dept. of Rehab. & Corr.*, 2011-Ohio-5961.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DON N. SHEPHERD, et al.,

     Plaintiffs,

     v.

OHIO DEPARTMENT OF
  REHABILITATION AND CORRECTION, et al.,

     Defendants.

Case No. 2010-06125

Judge Clark B. Weaver Sr.
Magistrate Anderson M. Renick

MAGISTRATE DECISION

{¶1} Plaintiffs brought this action alleging claims of constructive discharge, intentional infliction of emotional distress, negligent hiring, training, supervision and retention, negligent infliction of emotional distress, and loss of consortium.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Defendant, Ohio Department of Rehabilitation and Correction (DRC), hired plaintiff, Don Shepherd, to work at defendant, Mansfield Correctional Institution (ManCI), as a Food Service Coordinator (FSC) in June 2001. Prior to beginning his employment with ManCI, Shepherd had been employed by the United States Marine Corps. Shepherd testified that he enjoyed working in food service and that he had hoped to be promoted to managerial positions at DRC.

{¶3} On or about February 14, 2007, Shepherd entered the office of Food Service Manager (FSM) John Rodriguez to ask him a question. Shepherd testified that when he entered the room, Rodriguez began to rapidly click on his computer with his mouse. FSC Bradley Bailey was also in the room and later informed Shepherd that Rodriguez had been viewing pictures of nude women, which Rodriguez had received via e-mail. Shepherd advised Bailey to file an incident report, which he later filed with

---

[1] Plaintiffs' claim for promissory estoppel was dismissed pursuant to Civ.R. 41(B)(2).

the captain's office. (Plaintiffs' Exhibit 3.) Although Shepherd did not view any pornographic material, he too filed an incident report with the captain's office. (Plaintiffs' Exhibit 1.)

{¶4} Shepherd testified that later that evening, while working at his comic bookstore, FSM Joe Dancy called him via telephone. Although he was unable to speak with Dancy at that time, Shepherd returned Dancy's call shortly thereafter. According to Shepherd, Dancy stated that Shepherd's life would be a living hell at work if anything came of the incident report he had filed regarding Rodriguez. Shepherd filed another incident report regarding the telephone call. The report indicates that Shepherd did not feel personally threatened by the call. (Plaintiffs' Exhibit 2.) Shepherd testified that he was informed that nothing would be done because the incident had occurred outside of work.

{¶5} Shepherd stated that several days later while at work, he called Rodriguez to inspect the work he and FSC Keith Allen had completed on "the chow line." Shepherd testified that as Rodriguez was passing him on the line, Rodriguez drove his elbow into Shepherd's chest and then glared at him. Shepherd believed this was an attempt to intimidate him in retaliation for reporting Rodriguez for viewing inappropriate images at work, and he later reported the incident. (Plaintiffs' Exhibit 5.) FSC Allen testified that he saw Rodriguez bump into Shepherd, but that it looked like Rodriguez was checking the line and it did not appear intentional or forceful. Allen also reported the incident and was later interviewed as a part of the investigation.

{¶6} Shepherd testified that on or about March 2, 2007, he was in the tool room putting away his kitchen tools prior to finishing his shift. FSC Joseph Townley was also present in the room. According to Shepherd, Dancy began yelling at Shepherd and positioned himself in such a way as to entirely block the only doorway out of the tool room. Shepherd stated that he calmly sat down and waited for Dancy to leave. After Dancy left, Shepherd immediately reported the incident by filling out an incident report.

(Plaintiffs' Exhibit 6.)   Townley testified that he was on the opposite side of the room putting his tools away when he overheard a heated conversation between Dancy and Shepherd.   Townley stated that he was too far away to hear particulars and was not sure whether the conversation was work related.   According to Townley, it did not appear to him that Dancy was preventing Shepherd from leaving the tool room. Townley explained that he did not fill out an incident report because he personally did not feel trapped.

{¶7} Shepherd testified that, in addition to the above incidents, the managers referred to him as a "snitch" and a "bitch" in front of both his coworkers and inmates, and that his managers required him to perform tasks that he did not enjoy performing. Additionally, Shepherd explained that the managers scheduled him to work at inconvenient times and assigned him undesirable tasks as a form of informal punishment.   Shepherd testified that after he had reported Rodriguez for viewing inappropriate material, the scheduling coordinator frequently assigned him to, what he considered to be, the most undesirable tasks.  Shepherd admitted, however, that there are no rules prohibiting such conduct on the part of the managerial staff and that he never reported the name-calling to anyone.   Allen and FSC Douglas Danner both testified that they never heard Shepherd referred to as a snitch or bitch.[2]

{¶8} Shepherd also testified that during this time period he was planning a vacation to Hawaii with his wife, Donna Shepherd, and Dancy.  Donna testified that she and Shepherd purchased Dancy's airline ticket to Hawaii and that she left a message on Dancy's phone asking him to reimburse the Shepherds for the ticket.  Shepherd testified that the next day at work, Dancy was very angry that Shepherd's wife had attempted to contact him and began yelling at Shepherd in front of the staff.  According to Shepherd, Dancy told him to speak to him regarding only work related matters.   Shepherd subsequently filled out an incident report.  (Plaintiffs' Exhibit 7.)

---

[2]Danner testified by deposition.  See Plaintiffs' Exhibit 20.

{¶9} Shepherd testified that he had been working overtime in order to build up sufficient time to be able to take his vacation to Hawaii in April 2007. John Bond, personnel director at ManCI, explained that when an employee works overtime, he or she may choose to either be paid overtime or have it converted to comp-time. Bond testified that in order for the employee to receive comp-time, the employee must fill out a form and submit the form to payroll by noon on the Tuesday of the week in which the payroll is being processed. Bond explained that if payroll does not receive a form, then the employee will automatically receive overtime pay. Shepherd testified that he had timely filled out the forms requesting comp-time to cover his vacation to Hawaii but that he instead had received overtime pay. Shepherd explained that the forms are submitted to the FSM and that the FSM then forwards them to the payroll department. Shepherd asserted that the FSMs Dancy, Rodriguez, and Wolford deliberately disregarded his comp-time requests. Wolford denied such a claim.[3]

{¶10} Shepherd testified that as a result of these incidents at work, he began to feel anxious and nervous and that he dreaded going to work. Shepherd asserted that his anxiety caused him to develop acid reflux and that he vomited often. He reported that his relationship with his wife Donna and their children also deteriorated during this time period and that he became very withdrawn at home. Donna testified that Shepherd was often withdrawn and that he would "bring work home with him." Donna asserted that Shepherd's problems developed shortly after he had reported his supervisor for viewing inappropriate images at work. Donna testified that she had to perform more tasks at home than she normally did because of Shepherd's behavior.

{¶11} As a result of the problems, Shepherd contacted the prison help line and was referred to Ohio Behavioral Health for counseling. Shepherd met with Constance Brody, Ph.D., on March 13, 2007. Shepherd testified that he was diagnosed with

---

[3]Neither Dancy nor Rodriguez testified at trial.

depression and anxiety and was placed on temporary disability with the Ohio Department of Administrative Services beginning March 13, 2007.

{¶12} Brody testified in her deposition that on March 13, 2007, she met with Shepherd for an evaluation to determine whether he should be afforded disability. Brody diagnosed Shepherd as suffering from general depression and anxiety and major depression recurrent. Brody based her diagnoses upon the problems that Shepherd had reported during their initial interview; she suggested weekly consultations and encouraged Shepherd to receive psychotropic drug evaluations from his health care provider. Brody and Shepherd met a total of four times. Brody testified that Shepherd's final visit occurred on March 30, 2007, and that she expected Shepherd to return for continued appointments. Brody asserted that Shepherd did not mention that he was planning on resigning and that Shepherd's target date to return to work was April 17, 2007.

{¶13} While on disability, Shepherd did not receive his paychecks. Shepherd learned that his paychecks were being held and that he was being investigated for trying to use disability leave to go on vacation to Hawaii. Shepherd asserted that the investigation was in retaliation for reporting Rodriguez for viewing pornography at work. Bond testified that he was present during an investigatory interview with Shepherd and that the purpose of the interview was to determine whether the allegations regarding the trip to Hawaii were true. According to Bond, Shepherd was given an opportunity to provide information but declined to do so. Bond stated that Shepherd abruptly concluded the interview without providing him with any information.

{¶14} Janet Tobin, labor relations officer at ManCI, testified that Shepherd received no discipline for going to Hawaii and that the interview with Shepherd occurred early on in the investigatory process. Tobin explained that an incident report is written by an employee and then submitted to the captain's office. The report is then taken to the warden for review by an incident review committee. If there is belief that a violation has occurred, the report is returned to the supervisor who investigates, collects

evidence, and reports the information to the warden for review in a memorandum titled "fact finder."  At that point, if discipline appears necessary, a pre-disciplinary hearing is scheduled and the employee's prior discipline is investigated to determine where the employee is on the progressive discipline schedule.  Tobin testified that Shepherd was being investigated because he had allegedly stated that he was planning to take disability leave to go on his vacation to Hawaii.  According to Tobin, an employee may not use disability leave to go on a vacation.  Tobin reported that Shepherd did not receive any discipline for his vacation to Hawaii.

{¶15} Tobin testified that she also participated in the investigations into the allegations made in Shepherd's incident reports and that Dancy, Rodriguez, and Wolford all received discipline resulting from viewing inappropriate content at work. Tobin also testified that each of Shepherd's other incident reports were investigated by his supervisor, Lanny Imboden, FSM II.  Tobin explained that Imboden investigated the allegations and made recommendations in the fact finder.  Imboden, who supervises each of the five FSMs, testified that he did investigate the allegations made in Shepherd's incident reports but that he did not recommend any discipline.

{¶16} Shepherd testified that while he was on disability, Bond stopped by his store and asked when he was planning on returning to work.  Shepherd testified that he believed the "harassment" would never end and resigned on April 2, 2007.  Bond testified that he did visit Shepherd's store with a friend who was looking for baseball cards but denied doing so to harass Shepherd.  Wolford and Allen both testified that they were "surprised" when they learned that Shepherd had resigned.

**CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY**

{¶17} Plaintiffs seek recovery for common law retaliation under *Greely v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228.  Plaintiffs argue that

Shepherd was constructively discharged in violation of public policy for reporting his supervisor's inappropriate conduct.  See id. at 234.

{¶18} "The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 1996-Ohio-265, paragraph four of the syllabus.  "In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent.  They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the 'discharge' label."  Id. at 589.

{¶19} "An employee has an obligation not to jump to conclusions and assume that every conflict with an employer evidences a hidden intent by the employer to terminate the employment relationship.  *Simpson v. Ohio Reformatory for Women*, Franklin App. No. 02AP-588, 2003-Ohio-988, ¶25, citing *Jackson v. Champaign Natl. Bank & Trust Co.* (Sept. 26, 2000), Franklin App. No. 00AP-170.  Accordingly, Shepherd's belief that he was forced to resign must be evaluated "'without consideration of his undue sensitivities.'" *Risch v. Friendly's Ice Cream Corp.* (1999), 136 Ohio App.3d 109, 113, quoting *Wilson v. Firestone Tire & Rubber Co.* (C.A.6, 1991), 932 F.2d 510, 515.

{¶20} Plaintiffs claim that Shepherd's decision to resign was based upon the cumulative effect of the behaviors of his co-workers, including his supervisors, Rodriguez, Wolford, and Dancy.  Based upon the totality of the evidence, the court finds that while the incidents described by Shepherd may have been subjectively threatening to him, such incidents were not objectively threatening or so egregious or pervasive as to render the working conditions intolerable.  Moreover, several of the incidents described by Shepherd as threatening were not considered so by other witnesses to those events.  Furthermore, a reasonable interpretation of the incidents described by Shepherd does not permit an inference that his termination was imminent or that any

adverse employment decision was in the offing. The evidence also demonstrates that DRC investigated each of Shepherd's allegations and imposed discipline when necessary; Shepherd was never disciplined as a result of any of the investigations detailed above. In short, the court concludes that Shepherd was not compelled to resign his position.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

{¶21} To prove a claim for intentional infliction of emotional distress, plaintiffs must show that: "(1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious." *Hanly v. Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73, 82.

{¶22} In *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, quoting Restatement of the Law 2d, Torts (1965) 73, Section 46, Comment d, the court explained that liability in such cases "'has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'"

{¶23} The weight of the evidence does not persuade the court that the conduct of either Dancy, Wolford, Rodriguez, or any other DRC employee was "utterly intolerable in a civilized community." Therefore, plaintiffs have failed to prove their claim of intentional infliction of emotional distress.

**NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION**

**{¶24}** The elements of a negligent retention claim are the same as those for a negligent supervision and hiring claim. *Browning v. Ohio State Hwy. Patrol*, 151 Ohio App.3d 798, 2003-Ohio-1108, ¶67, citing *Harmon v. GZK, Inc.*, Montgomery App. No. 18672, 2002-Ohio-545. In order for plaintiffs to prevail on a claim for negligent hiring, training, supervision, and retention, they must prove: "'(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.'" *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 739, quoting *Ruta v. Breckenridge-Remy Co.* (Dec. 12, 1980), Erie App. No. E-80-39. Liability for negligent retention arises where an "employer chooses to employ an individual who 'had a past history of criminal, tortious, or otherwise dangerous conduct about which the [employer] knew or could have discovered through reasonable investigation.'" *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, ¶14, quoting *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 61.

**{¶25}** Other than the undisputed evidence of an employment relationship between Rodriguez, Dancy, Wolford, and DRC, plaintiffs have established none of the elements of this claim. Specifically, plaintiffs have failed to show that Dancy, Rodriguez, and Wolford were incompetent.

**{¶26}** Both Tobin and Imboden testified that each of Shepherd's incident reports were investigated to determine whether discipline was necessary. With respect to Shepherd's allegation that Rodriguez viewed inappropriate content at work, Tobin testified that each of the FSMs involved admitted to such conduct and were disciplined accordingly. Regarding the remainder of Shepherd's allegations of harassment by Wolford, Dancy, and Rodriguez, Imboden testified that he did not find enough evidence to proceed to discipline. In short, plaintiffs have failed to prove their claim of negligent hiring, training, supervision, and retention.

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

{¶27} Ohio courts limit recovery on a claim of negligent infliction of emotional distress to those instances in which an individual was a bystander to an accident or was in fear of physical injury to his own person.  *Paugh v. Hanks* (1983), 6 Ohio St.3d 72; *High v. Howard* (1992), 64 Ohio St.3d 82.  No such circumstances are alleged in plaintiffs' complaint nor were any facts of that nature presented at trial.  Accordingly, any claim of negligent infliction of emotional distress must fail.

**LOSS OF CONSORTIUM**

{¶28} The court finds that plaintiffs failed to prove their claims of constructive discharge, intentional infliction of emotional distress, and negligent hiring, training, supervision, and retention, by a preponderance of the evidence.  Therefore, the derivative claim for loss of consortium also must fail.  See *Bowen v. Kil-Kare, Inc.* (1992), 63 Ohio St.3d 84, 93.

{¶29} For the foregoing reasons, it is recommended that plaintiffs' claim of negligent infliction of emotional distress be dismissed, and that judgment be rendered in favor of defendants on plaintiffs' claims of constructive discharge, intentional infliction of emotional distress, negligent hiring, training, supervision, and retention, and loss of consortium. *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ANDERSON M. RENICK
Magistrate

cc:

Beth A. Owens                          Daniel R. Forsythe
John W. Allen                          Velda K. Hofacker
Marc V. Hedrick                        Assistant Attorneys General
24 West Third Street, Suite 200        150 East Gay Street, 18th Floor
Mansfield, Ohio 44902                  Columbus, Ohio 43215-3130

Filed October 21, 2011
To S.C. reporter November 18, 2011